RANSOM, & GILBERTSON, LLP
Michael K. Yeabsley OSB# 186157
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239
T: 503-226-3664

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JESSE MANGIAGLI, derivatively on behalf of EXPENSIFY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DAVID BARRETT, RYAN SCHAFFER, ANURADHA MURALIDHARAN, JASON MILLS, DANIEL VIDAL, TIMOTHY CHRISTEN, ELLEN PAO, YING (VIVIAN) LIU, BLAKE BARTLETT, and ROBERT LENT,<br><br>Defendants,<br><br>and<br><br>EXPENSIFY, INC.,<br><br>Nominal Defendant. | Case No.: 3:26-cv-544<br><br>**SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jesse Mangiagli ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Expensify, Inc. ("Expensify" or the "Company"), brings this Verified Shareholder Derivative Complaint against David Barrett ("Barrett"), Ryan Schaffer ("Schaffer"), Anuradha Muralidharan ("Muralidharan"), Jason Mills ("Mills"), Daniel Vidal ("Vidal"), Timothy Christen ("Christen"), Ellen Pao ("Pao"), Ying (Vivian) Liu ("Liu"), Blake Bartlett ("Bartlett"), and Robert Lent ("Lent") (collectively, the "Individual Defendants" and, together with Expensify, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Expensify with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *Wilhite v. Expensify, Inc. et. al.*, Case No. 3:23-cv-01784-JR (D. Or.) (the "Securities Class Action") and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain current and former Expensify officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between November 11, 2021, and November 8, 2023, inclusive (the "Relevant Period").

2. Expensify operates as an expense management software platform that "helps the smallest to the largest businesses simplify the way they manage money."

3. On October 15, 2021, Expensify filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with its initial public offering ("IPO"). The Registration Statement was declared effective by the SEC on November 9, 2021. On November 12, 2021, the Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO (the "Prospectus").

4. On November 15, 2021, the Company's common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ"), with Expensify selling 11.2 million shares of stock priced at $27.00 per share.

5. The Registration Statement represented that the Company uses a "bottom-up" business model that depends on customers' word-of-mouth recommendations based on the Company's reputation, especially amongst its customers and channel partners. The Registration Statement stressed that the "bottom-up" business model was essential to the Company's growth and allowed Expensify to avoid millions of dollars in operating expenses that are typical from traditional top-down marketing and further provided the Company with access to a $16 billion total addressable market.

6. The Company's ability to maintain and grow its customer base at an annual rate was essential to its financial success. The Registration Statement emphasized this point by stating that Expensify's success was contingent on "converting users who try free aspects of the Expensify platform into paid members. While our viral model means that employees or contractors often introduce Expensify into SMBs, companies subscribe and pay for the majority of our paid members."

7. However, the Company's positive statements were false and/or materially misleading in light of recent events that occurred just prior to the IPO. For example, in April 2020,

Expensify announced that, effective May 1, 2020, it would be increasing its per member pricing for the first time since implementing its subscription-based fee model in 2009, depending on the type of subscription. Expensify also changed its annual contract terms to be non-cancelable.

8. The May 2020 price increase outraged customers and negatively affected the Company's revenues and financial metrics. In addition, Expensify failed to make necessary product improvements to justify the price increases and meet customer satisfaction. Accordingly, Expensify materially changed its business model before the IPO to a more traditional outbound or go-to-market sales approach to stimulate the growth of its paid members and revenue.

9. Unbeknownst to investors, at the time of the IPO, Expensify's business model had dramatically shifted, its total mix of paid members had already begun to shift towards a greater number of subscriptions billed on a pay-per-use rate versus an annual rate, causing significant volatility in the Company's paid member rates from month-to-month, and as a result, the sustainability of Expensify's revenue growth was negatively impacted. As a result, the Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make statements not misleading and was not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Registration Statement contained false and misleading statements and/or failed to disclose material information relating to, among other things: (i) the massive price increase for the Company's expense management subscription services, resulting in the loss of significant customer contracts and worsening revenue mix; and (ii) due to customer losses caused by the Company's change in pricing, Expensify abandoned its historical "bottom-up" growth model in favor of a traditional "top-down" approach, resulting in further revenue mix volatility and unprecedented marketing expenses.

10. The truth fully emerged on November 7, 2023, when the company issued a press release announcing Expensify's financial results for the third quarter of 2023, revealing, among other things: (1) GAAP loss of $0.21 per share for the quarter, which equated to a revenue loss of $36.5 million, a 14% decrease compared to the same period the previous year; and (3) non-GAAP net loss was $6.7 million.

11. On this news, Expensify's common stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

12. In addition, the Individual Defendants breached their fiduciary duties by causing Expensify to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between May 1, 2023, and May 31, 2023, approximately 504,493 shares of Expensify's common stock were repurchased, which cost the Company over $2.9 million.

13. While the Company's stock was trading at artificially inflated prices, and before the truth was revealed, Defendants Barrett, Schaffer, Muralidharan, and Vidal breached their fiduciary duties by engaging in insider trading.

14. The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

15. As a result of the foregoing, the Securities Class Action was filed against the Company as well as Defendants Barrett, Bartlett, Schaffer, and Lent on November 29, 2023, in the United States District Court for the District of Oregon.

16. As a direct and proximate result of the Individual Defendants' misconduct, the Company incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

## VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 21D of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a)(1), and 78u-4(f), Rule 14a-9 of the Exchange Act (17 C.F.R § 240.14a-9), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

19. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

21. Plaintiff is a current shareholder of Expensify and has continuously held Expensify common stock at all relevant times.

22. Nominal Defendant Expensify is incorporated under the laws of Delaware and its principal executive offices are located at 88 Kearny Street, Suite 1600, San Francisco, CA 94108. Expensify's common stock trades on the NASDAQ under the symbol "EXFY."

23. Defendant Barrett has served as Expensify's CEO, President and Director since 2009. According to the proxy statement filed on Schedule 14A with the SEC on April 25, 2025

(the "2025 Proxy Statement"), in 2024, Defendant Barrett received $2,080,755 in total compensation from the Company.

24. Defendant Schaffer has served as Expensify's Chief Financial Officer ("CFO") and as a Company director since 2017. According to the 2025 Proxy Statement, in 2024, Defendant Schaffer received $1,236,856 in total compensation from the Company.

25. Defendant Muralidharan served as Expensify's Chief Operating Officer ("COO") from January 2021 and as a Company director from November 2021. Defendant Muralidharan left the Company on December 29, 2025. According to the 2025 Proxy Statement, in 2024, Defendant Muralidharan received $1,189,278 in total compensation from the Company.

26. Defendant Mills has served as a Company director since November 2021, and as Chief Product Officer ("CPO") since May 2021. Defendant Mills currently serves as a member of the Compensation Committee and the Executive Committee. According to the 2025 Proxy Statement, from January 1, 2024 to March 31, 20255, Defendant Mills received $1,462,774 in cash compensation and $390,964 in stack based compensation from the Company.

27. Defendant Vidal has served as a Company director since 2019 and as Chief Strategy Officer since May 2021. Defendant Vidal currently serves as a member of the Compensation Committee and the Executive Committee. According to the 2025 Proxy Statement, from January 1, 2024 to March 31, 2025, Defendant Vidal received $1,113,046 in cash compensation and $273,156 in stock based compensation from the Company.

28. Defendant Christen has served as a Company director since November 2021. Defendant Christen currently serves as Chair of the Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant Christen received $157,611 in total compensation from the Company.

29. Defendant Pao has served as a Company director since 2021. Defendant Pao currently serves as a member of the Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant Pao received $147,345 in total compensation from the Company.

30. Defendant Liu has served as a Company director since January 1, 2024. Defendant Liu currently serves as a member of the Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant Liu received $147,363 in total compensation from the Company.

31. Defendant Bartlett served as Company director from January 2015 until the Company's IPO in November 2021.

32. Defendant Lent served as a Company director from February 2018 until the Company's IPO in November 2021.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33. By reason of their positions as officers, directors, and/or fiduciaries of Expensify and because of their ability to control the business and corporate affairs of Expensify, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

34. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects

so that the market price of the Company's stock would be based on truthful and accurate information.

35. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

36. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all

times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

37. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

38. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and/or assisted each other in breaching their respective duties.

39. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

40. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

41. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Expensify, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

43. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Expensify and at all times acted within the course and scope of such agency.

## EXPENSIFY'S CODE OF CONDUCT

44. Expensify maintains a Code of Ethics and Conduct (the "Code"), which states that "[a]ll directors, officers and employees. . . of the Company. . . are expected to be familiar with the Code and to adhere to those principles and procedures set forth below." The Code further requires all covered parties to "conduct themselves accordingly, exhibiting the highest standard of business and professional integrity, and seek to avoid even the appearance of improper behavior." The Code provides that:

> In accordance with requirements of the Securities and Exchange Commission (the "SEC"), and the National Association of Securities Dealers Automated Quotations Stock Market ("Nasdaq") Listing Standards, the Board of Directors (the "Board") of Expensify, Inc. (the "Company") has adopted this Code of Ethics and Conduct (the "Code") to encourage:
>
> - Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
> - Full, fair, accurate, timely and understandable disclosure;
> - Compliance with applicable governmental laws, rules and regulations;
> - Prompt internal reporting of any violations of law or the Code;
> - Accountability for adherence to the Code, including fair process by which to determine violations;
> - Consistent enforcement of the Code, including clear and objective standards for compliance;
> - Protection for persons reporting any such questionable behavior;
> - The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and
> - Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

45. In a section titled "Conflicts of Interest," the Code provides the following, in relevant part:

> A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.
>
> For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that may make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a

Covered Party, or a member of his or her immediate family[] , receives improper personal benefits as a result of his or her position at the Company.

Conflicts of interest can also occur indirectly. For example, a conflict of interest may arise when a Covered Party is also an executive officer, a major shareholder or has a material interest in a company or organization doing business with the Company.

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Audit Committee of the Board.

This Code does not attempt to describe all possible conflicts of interest that could develop. Other common conflicts from which Covered Parties must refrain are set out below:

- Covered Parties may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.
- Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.
- No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company.

46. With respect to "Disclosures" the Code states:

The information in the Company's public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

47. In a section titled "Compliance with Laws, Rules and Regulations" the Code

states:

> The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.
>
> The principal executive officer, principal financial officer, principal accounting officer or controller (or persons performing similar functions) of the Company (together, the ***"Senior Financial Officers"***) are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.
>
> Covered Parties located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act ***("FCPA")*** and U.S. export control laws, in addition to applicable local laws.

(Emphasis in original).

## THE AUDIT COMMITTEE CHARTER

48. The Company also maintains an Audit and Finance Committee Charter (the "Charter"), the stated purpose of which is "to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

49. In a section titled "Duties and Responsibilities," the Charter provides, in relevant part:

> *Annual Financial Statements and Annual Audit*
>
> 3. *Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
> 4. *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.
>
> *Quarterly Financial Statements*
>
> 5. *Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor,

including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

_Other Duties and Responsibilities_

6. *Complaint Procedures.* The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.
7. *Related Party Transactions.* The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved or ratified by the Committee.
8. *Review of this Charter.* The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

## SUBSTANTIVE ALLEGATIONS

***Background***

50. Expensify is a cloud-based expense management software platform that purports to "help[] the smallest to the largest businesses simplify the way they manage money."

51. Prior to the IPO, small and medium-sized businesses ("SMBs"), including those with fewer than 1,000 employees, accounted for over 95% of Expensify's customers by revenue.

52. In April 2020, Expensify announced that, effective May 1, 2020, it would be increasing its per member pricing for the first time since implementing its subscription-based fee model in 2009 to varying degrees, depending on the type of subscription. At the same time, Expensify changed its annual contract terms to be non-cancelable.

53. According to one confidential witness ("CW1"), a sales manager and channel partner manager for Expensify from June 2020 to April 2023, who provided information to the plaintiff in the Securities Class Action, these changes outraged many customers who then ceased doing business with the Company, but the full extent of the resulting loss was delayed due to those

customers' contractual commitments.[1]

54. Expensify saw a decrease in paid members during the three-month period ended June 30, 2020, and the Registration Statement did not provide the actual per-member prices for any of the Company's subscriptions, on any rate, from before or after the May 2020 price increase.

55. As alleged in the Securities Class Action, Expensify failed to make the necessary product improvements to justify the price increases and meet customer satisfaction. CW7, a customer success manager at Expensify from March 2021 to February 2023, stated that the Company often made unexpected, sweeping changes to the process for handling customer accounts that upset customers and caused confusion and frustration for its employees.

56. The May 2020 price increase also negatively affected Expensify's revenues and financial metrics. According to CW2, a business operations specialist and product operations associate at Expensify from March 2015 to October 2022, Company executives regularly elevated the status of Expensify's internal "DEFCON" system, indicating the Company was strapped for cash. Accordingly, Expensify made the decision to materially change its business model before the IPO to a traditional outbound or go-to-market and sales approach to stimulate growth of its paid members and revenue.

57. Another former employee, an events marketing and operations project lead at Expensify from March 2018 to February 2024, identified as CW4, informed that around March 2021, the Company engaged in discussions about hiring sales development representatives ("SDRs"). According to CW4, these conversations led to Expensify hiring 60 SDRs before the IPO because the Company wanted to build up its customer base before going public. CW3, a marketing designer

[1] All confidential witness ("CW") allegations herein are based solely on the Securities Class Action complaint.

at Expensify from April 2019 to May 2022, disclosed that there was a big push in new advertising before the IPO, claiming Expensify created an especially large amount of content in the lead-up to the IPO.

58. Therefore, unbeknownst to investors, at the time of the IPO, Expensify's business model had changed, its total mix of paid members had already begun to shift towards a greater number of subscriptions billed on a pay-per-use rate versus an annual rate causing significant volatility in the Company's paid member rates from month-to-month, and as a result, the sustainability of Expensify's revenue growth was negatively impacted.

59. As a result, the Registration Statement contained false and misleading statements and/or failed to disclose material information relating to, among other things: (i) the massive price increase for the Company's expense management subscription services, resulting in the loss of significant customer contracts and worsening revenue mix; and (ii) due to customer losses caused by the Company's change in pricing, Expensify abandoned its historical "bottom-up" growth model in favor of a traditional "top-down" approach, resulting in further revenue mix volatility and unprecedented marketing expenses.

***Materially False and Misleading Statements Issued During the Relevant Period***

60. The Registration Statement referenced the Company's May 2020 "pricing change" when discussing "revenue" and "quarterly results of operations." The Registration Statement provided, in relevant part:

> Revenue increased $24.4 million, or 60%, for the six months ended June 30, 2021 compared to the same period in 2020, ***primarily due to a pricing change implemented in May 2020, which led to a gradual increase in per member price for our paid members*** from existing customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses and increased demand for business travel, which is a significant use case for our platform and drove an increase in the number of paid members, due to the lifting

> of travel restrictions within the United States and certain other countries and increased employers returning to the office as a result of the wide spread availability and distribution of COVID-19 vaccines.
>
> Our revenue in each of the quarters presented predominantly increased consecutively over periods presented primarily due to increased demand for our platform from both new and existing customers as well as an increase in our average paid members and ***a pricing change implemented in May 2020, which led to a gradual increase in per member price for our paid members*** from existing customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses. All new customers beginning on May 1, 2020, were subject to this pricing change. Our revenue was adversely affected by the COVID-19 pandemic in the quarter ended June 30, 2020, particularly due to the decrease in business travel, which is a significant use case for our platform, but this adverse impact was mitigated by the prevalence of our annual contracts and minimum user requirements in those contracts.

(Emphasis added).[2]

61. The Registration Statement also referenced Expensify's May 2020 price increase when discussing potential "risks" faced by the Company. In pertinent part, the Registration Statement provided that:

> A majority of our subscriptions are driven by bottom-up adoption related to our expense management feature. Although we have added, and expect to continue to add, new features to expand our offerings, and all of our features are accessible under a single subscription, at least in the near term, we expect our expense management feature to continue to drive the majority of our subscriptions. As a result, market acceptance of our expense management feature is critical to our success. Demand for our expense management feature, as well as our other features, is affected by a number of factors, many of which are beyond our control, such as the adoption of our features by new and existing customers; the timing of development and release of upgraded or new features on our platform; products and services introduced or upgraded by our competitors or partners; our ability to determine optimal pricing for our platform, including in international markets; pricing offered by our competitors; technological change; and growth or contraction in our addressable market. ***We recently increased our subscription prices, and we do not know if these price increases will adversely affect our business.*** If we are unable to meet customer demand for our expense management feature; do not price our subscriptions optimally or make changes to our subscription or pricing models that are not

[2] Emphasis added by the Plaintiff is displayed as text that is both bold and italicized. All other emphasized is displayed as formatted in the original text.

> accepted by the market; or fail to convert members of our free expense management feature or trial subscriptions to paying subscribers, our business, results of operations, financial condition and growth prospects will suffer.
>
> ***
>
> We have in the past, and may in the future, need to change our pricing model from time to time. As the market for our platform matures, or as competitors introduce new solutions that compete with ours, we may be unable to attract new customers at the same prices or based on the same pricing models that we have used historically. While we do and will attempt to set prices based on our prior experiences and customer feedback, our assessments may not be accurate and we could be underpricing or overpricing our platform. In addition, if the offerings on our platform change, then we may need to revise our pricing strategies. Any such changes to our pricing strategies or our ability to efficiently price our offerings could adversely affect our business, operating results and financial condition. ***Pricing pressures and decisions could result in reduced sales, reduced margins, losses or the failure of our platform to achieve or maintain more widespread market acceptance, any of which could negatively impact our overall business, operating results and financial condition***. Moreover, the organizations which we target may demand substantial price concessions. As a result, we may be required to price below our targets in the future, which could adversely affect our revenue, profitability, cash flows and financial condition.

(Emphasis added).

62. The statements detailed above were false and/or misleading because they failed to disclose the magnitude of Expensify's May 2020 price increase and that the increase had already caused the Company to lose customers. At the time of the IPO, the Company's May 2020 price increase and annual contract modification, and subsequent failure to make necessary product improvements to meet customer satisfaction and remain competitive in the marketplace, negatively impacted customer retention and expansion. Expensify had already failed to price its subscriptions optimally, these price increases also had already adversely affected Expensify's business, and the Company was already failing to convert free subscription users into paid subscribers. Therefore, these negative outcomes were not merely hypothetical possibilities but had already materialized at the time the Company released the above statements. Additionally, the Company's representations

that revenue for the six-month period ended on June 30, 2020, was "adversely affected" due to a "decrease in business travel" were materially false and misleading, because in truth, the Company's massive price increases had also materially adversely affected revenues for that period.

63. The Registration Statement also described Expensify's historical advertising and marketing strategy, describing it as a "bottom-up" approach that saved the Company millions of dollars in advertising expenses. The Registration Statement provided, in relevant part:

> ***Our intense focus on improving the everyday experience of regular employees with an easy-to-use but powerful platform has enabled a viral, "bottom-up" business model that is capital efficient and extremely scalable.*** By allowing people to spend less time managing receipts and more time pursuing their real goals, our users (who we refer to as members) have adopted, championed and spread Expensify to their colleagues, managers and friends. ***We believe our happy members are the best form of marketing and our self-service, bottom-up approach takes advantage of strong, organic word-of-mouth adoption.*** Underlying our platform is a secure, scalable and defensible technology and user-centric legal foundation that supports and fuels our viral growth. ***The combination of these factors has allowed us to avoid the costly pitfalls of traditional, top-down enterprise sales and marketing methods that focus solely on decision makers, and invest our time and resources on making features our members love.*** This has created a massive, untapped and growing market opportunity for us that we believe we are in prime position to capture.
>
> ***
>
> • ***Viral, bottom-up business model driven by the employee.*** Our employee-focused platform strategy enables a viral, "bottom-up" adoption cycle that starts with an individual employee. After signing up for free on the website or downloading our free app to submit expenses and realizing the benefits of using Expensify, our enthusiastic members champion our platform internally, spreading it via word-of-mouth to other employees and convincing decision maker to adopt Expensify company-wide. This enables us to focus our time and resources making our features better for our members, and avoid the reliance on a costly, traditional top-down sales and marketing approach to attract and retain customers.
>
> • ***Word-of-mouth adoption supported by a market consensus approach.*** We believe that our happy members are the best form of marketing. We strive to build a superior platform that makes the lives of employees and admins easier so that they become our champions and promote us to other individuals and organizations. We deploy large scale brand advertising to build on this platform superiority and help create market consensus that Expensify is the category leader for expense

management software. We believe this enables us to focus on creating great features for our members rather than rely on the expensive and ineffective activities of traditional sales and marketing to drive customer acquisition.

***

***We also leverage partnerships with accounting and bookkeeping firms, who provide validation of our platform and refer customers to us.*** We partner with strategic accounting software partners such as Intuit, NetSuite, Xero and Intacct to integrate our software in their clients' back offices, and recognize us as a top expense tool when their clients are browsing and selecting integrated solutions. Additionally, our *ExpensifyApproved!* Partner Program trains and supports accountants to use our platform and encourages their customers to use Expensify. We work hard to maintain top expense partner status with all partners to support our market consensus strategy. The strength of our alliances is highlighted by frequent distinction by our partners, including being named NetSuite's Innovation Partner of the Year, Xero's App Partner of the Year and one of the most reviewed "Popular Apps" on the Intuit Quickbooks platform.

***

***We believe that our frictionless, viral and bottom-up business model and word-of-mouth adoption allows us to not rely on traditional outbound marketing efforts that are costly and often ineffective.*** As a result, we can dedicate our energy and resources on strengthening our brand, improving our features and making it easier for more people to adopt Expensify.

***

***The traditional approach for software sales has historically been "top-down," whereby software providers deploy costly, targeted ads and a legion of sales representatives focused on selling large, multi-year deals with vague product specifications to decision makers and business owners.*** These solutions are specified, deployed and configured by siloed IT departments with little-to-no input from the main consumers of business software: everyday employees. This type of approach poses key challenges for traditional software providers, including:

• ***High cost of sale. The traditional top-down approach relies on an army of salespeople to sell, retain and upsell decision makers, requiring an ever-increasing pipeline of sales talent. This makes finding, recruiting and retaining sales talent a significant bottleneck for growth and results in a very high cost of sale -- and more importantly, limits growth to the small corner of the market that can sustain that high cost of sale.***

***

• ***Viral, bottom-up business model. We leverage an efficient, self-service business model driven by the viral, bottom-up adoption of our platform by employees.*** After

the initial use of Expensify by employees, they realize time savings and improved productivity and recommend our platform to other colleagues and departments within their organization. ***Unlike the costly traditional enterprise sales method that focuses on a smaller set of decision makers, our intense focus on the employee enables zero marginal costs for new leads, provides hundreds of entry points into every customer,*** and allows us to profitably sell to large portions of the market, from one-person businesses to the largest organizations in the world.

• ***Recognized market consensus and efficient word-of-mouth. Our members drive the adoption and expansion of Expensify within organizations, and our platform and business model are intensely focused on improving their everyday experience. This creates positive and powerful word-of-mouth that drives incredibly efficient and scalable organic customer acquisition and marketing.*** Every employee in every company in the world is a legitimate prospect to us, and since employees greatly outnumber managers in every business, we do not have to laser target our marketing to narrowly qualified decision makers. This means that we have access to exponentially more advertising inventory than traditional top-down sales models and a massive opportunity to create awareness.

***

We believe that these strengths set us apart from our competition and put us in a powerful position to maintain and expand our market leadership as we add new features and our industry grows.

(Emphasis added).

64. In a section titled "Recent developments," the Registration Statement provided preliminary consolidated financial results for the fiscal quarter ended September 30, 2021, including, in relevant part:

*Revenue*

Our preliminary estimated revenue is expected to be between $36.6 million and $37.6 million for the fiscal quarter ended September 30, 2021, which represents a range of ***increase of approximately $14.9 million to $15.9 million compared to the fiscal quarter ended September 30, 2020, which was due to an increase in paid members.***

***

*Paid members*

Our preliminary estimated number of average paid members as of September 30,

> 2021 are expected to be between 660,000 and 670,000, an increase of 21,000 to 31,000 from our average paid members as of June 30, 2021 and an increase of 27,000 to 37,000 from our average paid members as of September 30, 2020. ***Our preliminary estimated number of average paid members increased due to improving economic business conditions and our increased investments in sales and marketing.***

(Emphasis added).

65. In a section titled "Key factors affecting our performance" the Registration Statement listed "Investing to Maintain Market Consensus," which provided the following:

> ***Our viral and word-of-mouth adoption model is effective in part because we have established ourselves as a recognized leader in expense management for SMBs.*** We deploy large scale brand advertising to promote our platform superiority and create market consensus that Expensify is the category leader for expense management software. We believe ***this enables us to focus on creating great viral features for our members rather than relying on low-margin, unscalable activities of traditional sales and marketing to drive customer acquisition.***

(Emphasis added).

66. The above statements were false and/or materially misleading because by the time they were transmitted, Expensify had already abandoned its "bottom-up" marketing strategy for its IPO and transitioned to a traditional to-down marketing strategy. By the time of the IPO, contrary to the language of the Registration Statement, the Company's word-of-mouth adoption was not "strong" and the Company's self-service, bottom-up approach was not generating growth as intended. Indeed, Expensify's "viral and word-of-mouth adoption model" was no longer as effective, and Expensify had already begun to rely on "low-margin, unscalable activities of traditional sales and marketing to drive customer acquisition." Furthermore, the Registration Statement failed to disclose that: (i) Expensify's increase in paid members and resulting revenue increase were the result of a material change in the Company's business model; (ii) Expensify's total mix of paid members had already begun to shift towards a greater number of members billed under pay-per-

use plans versus annual plans causing significant volatility in the Company's paid member rates from month-to-month; and (iii) as a result, the sustainability of Expensify's revenue growth was negatively impacted.

67. On April 29, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement solicited shareholders to vote for, among other things, the reelection of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, thereby allowing them to continue to breach their fiduciary duties to Expensify.

68. Regarding the Company's Code of Conduct, the 2022 Proxy Statement provided, in relevant part:

> We have adopted a written code of ethics and conduct that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code is available on our investor relations website at investors.expensify.com. In addition, we intend to post on our investor relations website all disclosures that are required by law or the listing standards concerning any amendments to, or waivers from, any provision of the code. The information on or accessed through our website is deemed not to be incorporated in or part of this Proxy Statement or any other document filed with or furnished to the SEC.

69. With respect to the Boards's role in "Risk Oversight," the 2022 Proxy Statement provided, in relevant part:

> Our Board of Directors is responsible for overseeing our risk management process. Our Board of Directors focuses on our general risk management strategy, the most significant risks facing us, our material environmental, social and governance ("ESG") risks and oversees the implementation of risk mitigation strategies by management. Our Board of Directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

70. The Individual Defendants caused the 2022 Proxy Statement to be materially false and misleading because they failed to disclose that Expensify had already abandoned its "bottom-

up" marketing strategy, and thus the Company had exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term projections referenced in the Registration Statement. The 2022 Proxy Statement further failed to disclose that, due to the foregoing, the Company had overstated its post-IPO growth, business, and financial prospects. In addition, despite assertions to the contrary, the Company lacked adequate internal controls and had permitted violations of its Code of Conduct.

71. On April 28, 2023, the Company filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited shareholders to vote for, among other things, the reelection of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, thereby allowing them to continue to breach their fiduciary duties to Expensify.

72. The 2023 Proxy Statement contained substantially similar statements concerning the Company's Code of Conduct and the Board's role in risk oversight as the 2022 Proxy Statement, and for the same reasons stated above, was materially false and misleading. Likewise, as a result of the materially false and misleading 2023 Proxy Statement, Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu were allowed to continue to breach their fiduciary duties to the Company.

***The Truth Emerges***

73. The truth concerning Expensify's decisions came to light gradually. First, it was revealed in the form of analyst downgrades, and later through admissions and revelations from the Company. On June 12, 2023, market analyst Morgan Stanley downgraded Expensify from Equal-weight to Underweight, stating "We expect EXFY to face challenges near-term as the core business works through structural and macro-related headwinds, and new product contribution remains

highly uncertain."

74. On this news, Expensify's stock price fell $0.45 per share, or 6.28%, to close at $6.72 per share on June 12, 2023.

75. On August 8, 2023, Expensify issued a press release announcing its financial and operating results for the quarter ended June 30, 2023. Expensify reported GAAP earnings per share ("EPS") of -$0.14, missing the consensus estimate of -$0.07. In addition, the press release reported revenue of $38.9 million, a 10% decrease compared to the same period last year, a net loss of $11.3 million, compared to $8 million for the same period last year, and a Non-GAAP net loss of $1 million. The Company further reported that it had 742,000 paid members, which is a decrease of 2% from the same period last year.

76. On that same day, the Company hosted an earnings call with analysts and investors to discuss results from the second quarter of 2023. During the call, when asked whether the Company intended to reaffirm its previously issued long-term 25%-35% revenue guidance, Defendant Muralidharan responded, in relevant part:

> [. . .] I'll say this for a few quarters now, since the day we went public really, we have not been in sort of normal or stable economic conditions. And for a few quarters now, we keep reaffirming that long-term guidance, and we keep getting questions all around and they're fair, when will this long-term guidance actually be true since we haven't been close to the long-term guidance in terms of growth.
>
> So we actually took all of your feedback and removed it because we just don't know what we don't know. We haven't been in stable condition since 2020 with this or that or the other. Like first there was a pandemic, then there was concerns of the global recession, then there was a global recession. There still is, like I'm fuzzy on the details, but very chaotic. ***So we've removed it and then once we sort of hit stability again, we will be able to reaffirm it, but we don't want to keep giving you outdated long-term guidance, if you will. So that's the reason we took it away.***

(Emphasis Added).

77. In a report issued August 9, 2023, JMP Securities LLC issued an analyst report

highlighting that, beginning in the three-month period ended September 30, 2021 (just prior the November 2021 IPO), and continuing through to the present, Expensify's revenue growth had slowed dramatically. Following this news, Expensify's stock price fell $1.69 per share, or 28.55%, to close at $4.23 per share on August 9, 2023.

78. On September 15, 2023, J.P. Morgan Securities LLC initiated coverage of Expensify, assigning an "Underweight" rating, citing "limited differentiation vs. competitors that aid in easing expense management, bill paying, invoicing, etc." and "challenging revenue mix and distribution model." Following this news, Expensify's stock price fell $0.35 per share, or 9.19%, to close at $3.46 per share on September 15, 2023.

79. On November 7, 2023, Expensify issued a press release announcing its financial and operating results for the quarter ended September 30, 2023. The press release stated, in relevant part:

> **Financial:**
>
> • ***Revenue was $36.5 million, a decrease of 14% compared to the same period last year.***
> • The Company utilized $5.1 million cash in operating activities.
> • Free cash flow was $(7.1) million.
> • ***Net loss was $17.0 million, compared to $8.2 million for the same period last year.***
> • Non-GAAP net loss was $6.7 million.
> • Adjusted EBITDA was $(3.5) million.
> • Interchange derived from the Expensify Card grew to $3.1 million, an increase of 65% compared to the same period last year.
> • Immediately following the end of the current quarter, the Company deployed$36.0 million of available cash to further reduce outstanding debt by paying off its term loan in full.
>
> **Business+**
> • **Paid members** – ***Paid members were 719,000, a decrease of 6% from the same period last year.***

(Emphasis added).

80. During an earnings call hosted by the Company the same day, Defendant Schaffer discussed the Company's quarterly revenue results, stating in relevant part:

> So revenue was $36.5 million, which is a 14% decrease from the same period last year. That's driven by a number of things. One is a decrease in activity and our user base. And [Defendant Muralidharan] just spoke about user expansion being one of the biggest growth drivers for Expensify. ***And in recent periods, we've actually seen the growth expansion decrease, that's in the 12, 13-plus years of the company, that's really only happened twice and once with in COVID and once it's right now. So in the history of the company, generally, our customers once they onboard, they stay and they grow. What we're seeing now is a decrease in activity from our customers, which is causing a headwind to revenue.***

(Emphasis added).

81. Following this news, Expensify's stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

## THE INDIVIDUAL DEFENDANTS CAUSED EXPENSIFY TO REPURCHASE ITS OWN COMMON STOCK AT INFLATED PRICES

82. During the Relevant Period, the Individual Defendants caused the Company to repurchase its own common stock at inflated prices, which substantially damaged the company. As set forth in the Company's quarterly report filed on Form 10-Q with the SEC on August 9, 2023, between May 1, 2023, and May 31, 2023, the Company purchased 504,493 shares of its own common stock at an average price of $5.93 per share, for approximately $2,991,643.49 in total. As the Company's stock was actually worth $1.83 per share, the price at closing on November 8, 2023, the Company overpaid by approximately $2,068,421.30 for repurchases of its own stock between May 1, 2023, and May 31, 2023.

## INSIDER TRADING BY THE INDIVIDUAL DEFENDANTS DURING THE RELEVANT PERIOD

83. During the Relevant Period and while in possession of material non-public

Company information, Defendants Barrett, Schaffer, Muralidharan, and Vidal (the "Insider Selling Defendants") sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein. These sales enabled the Insider Selling Defendants to avoid the staggering losses the Company's other stockholders suffered.

84. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Barrett sold 940,000 shares of Expensify stock, receiving gross proceeds of $5,780,964 as reflected in the following chart.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 12, 2022 | 30,000 | $13.86 | $415,800 |
| November 10, 2022 | 30,000 | $12.33 | $369,900 |
| December 14, 2022 | 30,000 | $9.56 | $286,800 |
| January 11, 2023 | 30,000 | $9.08 | $272,400 |
| February 8, 2023 | 30,000 | $9.80 | $294,000 |
| March 9, 2023 | 30,000 | $8.28 | $248,399 |
| April 12, 2023 | 30,000 | $8.17 | $245,100 |
| May 10, 2023 | 30,000 | $5.99 | $179,700 |
| June 1, 2023 | 200,000 | $6.55 | $1,310,000 |
| June 14, 2023 | 30,000 | $6.99 | $209,700 |
| July 12, 2023 | 30,000 | $7.52 | $225,600 |
| August 9, 2023 | 30,000 | $4.26 | $127,800 |
| September 8, 2023 | 263,333 | $3.96 | $1,042,798 |
| September 11, 2023 | 66,667 | $3.88 | $258,667 |
| September 12, 2023 | 20,000 | $4.09 | $81,800 |
| September 13, 2023 | 30,000 | $3.86 | $115,800 |
| October 11, 2023 | 30,000 | $3.19 | $96,700 |

85. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schaffer sold 161,593 shares of Expensify

stock, receiving gross proceeds of $3,461,631 as reflected in the following chart.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 15, 2021 | 119,996 | $25.11 | $3,013,099 |
| July 8, 2022 | 4,699 | $20.11 | $94,496 |
| July 29, 2022 | 4,699 | $20.01 | $94,026 |
| August 24, 2022 | 4,699 | $20.00 | $93,980 |
| June 21, 2023 | 7,750 | $8.04 | $62,309 |
| July 3, 2023 | 400 | $8.00 | $3,200 |
| July 13, 2023 | 7,350 | $8.00 | $58,800 |
| August 1, 2023 | 100 | $8.00 | $800 |
| August 31, 2023 | 3,900 | $4.39 | $17,121 |
| September 29, 2023 | 4,000 | $3.28 | $13,120 |
| October 31, 2023 | 4,000 | $2.67 | $10,680 |

86. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Muralidharan sold 47,190 shares of Expensify stock, receiving gross proceeds of $347,920 as reflected in the following chart.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 26, 2023 | 20,000 | $10.00 | $200,000 |
| June 13, 2023 | 14,390 | $7.00 | $100,730 |
| September 15, 2023 | 13,000 | $3.63 | $47,190 |

87. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Vidal sold 23,000 shares of Expensify stock, receiving gross proceeds of $176,620 as reflected in the following chart.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|

| | | | |
|---|---|---|---|
| December 20, 2022 | 5,000 | $8.97 | $44,850 |
| February 15, 2023 | 5,000 | $9.82 | $49,100 |
| June 20, 2023 | 8,000 | $7.59 | $60,720 |
| September 1, 2023 | 5,000 | $4.39 | $21,950 |

88. As a result of the false and misleading statements and the failures to disclose, the Insider Selling Defendants sold stock at artificially inflated share prices not reflective of the Company's value, which the Insider Selling Defendants knew at the time they made those sales.

## DAMAGES TO EXPENSIFY

89. As a direct and proximate result of the Individual Defendants' misconduct, Expensify has expended and will continue to expend significant sums of money.

90. Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

91. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

92. As a direct and proximate result of the Individual Defendants' conduct, Expensify has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

93. Plaintiff brings this action derivatively in the right of and for the benefit of Expensify to redress injuries suffered, and to be suffered, as a direct and proximate result of the

Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

94. Expensify is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

95. Plaintiff is an owner of Expensify stock and has been a continuous shareholder of Company stock at all relevant times.

96. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

97. The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

98. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

99. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

100. On August 13, 2025, Plaintiff, through Plaintiff's counsel, sent a demand on Expensify's Board to investigate the violations of law described herein and to pursue litigation against the Individual Defendants for breaching their fiduciary duties by allowing Expensify to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A.

101. The Demand outlined alleged misstatements made during the Relevant Period, detailed therein. Specifically, the Demand alleged that Expensify dramatically changed its business model at the time of its IPO, which altered its total mix of paid subscribers towards a greater number of subscriptions billed on a pay-per-use rate versus an annual rate, thereby causing significant volatility in the Company's paid member rates from month-to-month, a change that ultimately negatively impacted the sustainability of Expensify's revenue growth.

102. The Demand further detailed the false and misleading statements contained in the Registration Statement as well as the 2022 and 2023 Proxy Statements. The Demand additionally expressed concern with respect to Expensify's repurchase of shares during the relevant period as well as a series of insider transactions conducted by the Insider Selling Defendants that occurred while the Company's stock price was artificially inflated.

103. On September 16, 2025, Plaintiff received a letter on behalf of the Board (the "Demand Refusal Letter"). The Demand Refusal Letter stated that the Board had concluded that resolution of Plaintiff's demand would be premature and instead chose to "defer a final decision on the Demand pending resolution of substantially overlapping litigation." The Demand Refusal Letter is attached hereto as Exhibit B.

104. At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu (the "Director Defendants").

105. The Board wrongfully refused Plaintiff's Demand and has failed to take any action to correct the breaches of fiduciary duty alleged in the Demand.

106. The Demand Refusal Letter does not contain a written report in connection with the Board's decision to refuse the Demand. In failing to produce a report, the company neglected

to keep a proper record of its evaluation to allow Plaintiff and the Court to assess the reasonableness of its methodology in deciding to refuse the Demand. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

107. The Demand Refusal Letter asserts that the Board's refusal of the demand is reasonable, citing, *inter alia*, the ongoing nature of "substantially overlapping litigation" as sufficient cause to refuse the demand. The Demand Refusal Letter does not, however, contain any evaluation of the merits of the Demand, nor does it communicate the Board's conclusions regarding the merits of the Demand.

108. The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the Company's best interest to pursue them. Given this lack of good faith, the Board's deferral of consideration of the Demand constitutes a constructive refusal of the Demand.

109. The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information by plainly disregarding the merits of the claims and allegations in the Demand.

110. For the foregoing reasons, the Board's refusal of the Demand falls outside of the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of Expensify.

**COUNT ONE**

**Against the Director Defendants for Violations of Section 14(a) of the Exchange Act**

111. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112. The Director Defendants solicited the 2022 and 2023 Proxy Statements containing materially false and misleading statements and/or omissions.

113. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

114. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

115. The 2022 and 2023 Proxy Statements failed to disclose, among other things, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Registration Statement; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and

misleading at all relevant times.

116. In addition, the 2022 and 2023 Proxy Statements failed to disclose that contrary to their statements regarding the Board's risk oversight functions, the Individual Defendants breached the Code and the Charter by causing the Company to issue false and misleading statements

117. In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 and 2023 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

118. The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

119. Plaintiff on behalf of Expensify has no adequate remedy at law.

## COUNT TWO

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

120. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

121. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Expensify. Not only is Expensify now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in the Securities Class Action, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Expensify by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants

caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Expensify.

122. During the Relevant Period, the Individual Defendants caused the company to overpay by approximately $2,068,421.30 million to repurchase roughly 504,493 shares.

123. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

124. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Expensify not misleading.

125. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Expensify.

126. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The

Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

127. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

128. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

129. Plaintiff on behalf of Expensify has no adequate remedy at law.

**COUNT THREE**

**Against the Individual Defendants for Breach of Fiduciary Duties**

130. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Expensify's business and affairs.

132. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

133. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the

rights and interests of Expensify.

134. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

135. In further breach of their fiduciary duties owed to Expensify, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) the massive price increase for the Company's expense management subscription services, resulting in the loss of significant customer contracts and worsening revenue mix; and (ii) due to the customer losses caused by its change in pricing, Expensify abandoned its historical "bottom-up" growth model in favor of a traditional "top-down" approach resulting in further revenue mix volatility and unprecedented marketing expenses.

136. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

137. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

138. The Individual Defendants had actual or constructive knowledge that they had

caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

139. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Expensify has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141. Plaintiff on behalf of Expensify has no adequate remedy at law.

**COUNT FOUR**

**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

142. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their

fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

144. Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Unjust Enrichment

145. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Expensify.

147. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Expensify that was tied to the performance or artificially-inflated valuation of Expensify or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

148. Plaintiff, as a shareholder and a representative of Expensify, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

149. Plaintiff on behalf of Expensify has no adequate remedy at law.

## COUNT SIX

**Against the Individual Defendants for Waste of Corporate Assets**

150. Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

151. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

152. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

153. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

154. Plaintiff, on behalf Expensify, has no adequate remedy at law.

**COUNT SEVEN**

**Against the Individual Defendants for Gross Mismanagement**

155. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

156. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

157. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

158. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT EIGHT

### Against the Insider Selling Defendants for Insider Selling and Misappropriation of Information

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160. At the time of their stock sales set forth herein, the Insider Selling Defendants (Barrett, Schaffer, Muralidharan, and Vidal) knew of the information described above and sold Expensify common stock on the basis of such information.

161. The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Expensify common stock.

162. The Insider Selling Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

163. Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E. Awarding punitive damages;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 20, 2026

*/s/ Michael Yeabsley*
RANSOM & GILBERTSON, LLP
Michael K. Yeabsley
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239
T: 503-226-3664

*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**

*/s/ Phillip Kim*
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

Docusign Envelope ID: 196A96E7-B65C-46EC-B38A-28E29039B1EE

**VERIFICATION**

I, Jesse Mangiagli, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

3/17/2026

DocuSigned by:

EB3DB6FA382D4ED...

Jesse Mangiagli